WALLER ET AL., TRUSTEES (UNDER THE LAST WILL AND TESTAMENT) OF WALLER, *v.* TEXAS & PACIFIC RAILWAY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 92. Argued December 17, 1917.—Decided January 7, 1918.

Plaintiffs, as testamentary trustees, sought to hold the Texas & Pacific Railway Company, as by an express trust, for the satisfaction of certain bonds, part of an issue made under a deed of trust, in 1872, by the New Orleans, Baton Rouge & Vicksburg Railway Company. The deed purported to cover the right of way and aid lands, then unearned, which had been granted to that company by § 22 of the act creating the Texas & Pacific (Act of March 3, 1871, c. 122, 16 Stat. 573); and the contention, generally stated, was that the Texas & Pacific, by succession to the benefits of the grant through a quit-claim made by the grantee, in 1881, to an intervening company, by construction of the railroad by that company and by a practical merger with it in that year, had become directly and expressly liable—this in view of the terms of the deed of trust, of the act of Congress and the instrument of consolidation, and the circumstances attending the transactions. When the suit began, in 1913, the bonds were more than 10 years overdue, and interest had been in default since 1876, or longer; the railroad had been owned and operated by the Texas & Pacific since the merger; the aid lands had been held, mortgaged and otherwise dealt with as the property of the intervening company, subject to the merger agreement, and the validity of the deed of trust of 1872 had been challenged in 1890, and denied by a decree taken *pro confesso* against the trustee, which, however, the plaintiffs here claimed was collusive, and not binding, and not applicable to the right of way. The bonds in suit were owned by plaintiffs' decedent for seven or eight years before his death, but whether he was an original holder or purchaser did not appear, nor was there any evidence concerning his notice or knowledge. *Held*, without deciding the merits, that the suit, begun in 1913, was barred by laches. For even if it be assumed that under the deed of trust an action could not have been maintained for the interest until the bonds matured in 1902, yet no attempt was

made to avail of a provision for the taking of possession by the trustee, at request of any bondholder, for default of interest; and furthermore the court may neither suppose nor indulge an ignorance of the open activities of the companies and the long possession and operation of the railroad by the defendant. *Held*, further, that the fact that the defendant had itself paid off most of the bonds issued with plaintiffs' was immaterial in the absence of the reasons for so doing; and that, in view of the magnitude of the recovery sought (more than $100,000) and the long claim and operation of the property and expenditures upon it, the delay could not be excused upon the assumption that defendant's position had not changed since 1881, when its liability, if any, accrued.

229 Fed. Rep. 87, affirmed.

SUIT to compel payment of thirty bonds issued by the New Orleans, Baton Rouge & Vicksburg Railroad Company under the circumstances hereinafter detailed. It was originally brought against appellee and the New Orleans Pacific Railroad Company and the Union Trust Company of New York. The latter company was dismissed from the suit. No process was issued against the New Orleans Pacific Railroad Company.

The bill presents the jurisdictional qualification of the parties and the following facts, which we state narratively:

The New Orleans, Baton Rouge & Vicksburg Railroad Company, which we shall refer to as the Baton Rouge Company, was incorporated December 30, 1869, by a special act of the Louisiana legislature and was given the usual powers to execute the purpose of its incorporation, to borrow money and issue bonds, etc., and secure their payment by a mortgage of its stock and franchises and property which it then owned or might thereafter acquire.

The Texas & Pacific Railway Company, herein referred to as the Texas & Pacific Company, was incorporated March 3, 1871, by an Act of Congress (16 Stat. 573, c. 122), and was granted certain lands to aid in the construction of its road; and by a section of the act (§ 22) a grant was made to the Baton Rouge Company of the

same kind, that is, alternate sections of public lands per mile, in the State of Louisiana, upon the condition that the company complete the whole of the road within five years of the passage of the act, the lands to be selected on each side of its road on a route to be selected by the company to connect with the Texas Pacific at the eastern terminus of the latter, through the public land from New Orleans to Baton Rouge and thence by the way of Alexandria. The company was empowered to mortgage the lands.

September 4, 1872, it exercised the power and executed a mortgage or deed of trust to the Union Trust Company of New York, transferring and conveying, among other things, all of its railroad and personal property and all the right, title and interest it then had or it or its successors might acquire to the granted lands. The trust company accepted of record its trusteeship.

The mortgage was intended to secure 12,000 bonds of $1000 each, payable September 1, 1902, with interest at 7%, payable semiannually; 1,250 of the bonds were issued and certified by the trustee.

Complainants, as executors and trustees of the estate under the will of David J. Waller, who died in 1893, are the owners and holders before maturity of 30 of the bonds with 52 coupons attached thereto.

It was covenanted in the mortgage by the trustee thereof that a sinking fund should be established and maintained and an amount equal to 1% of the company's gross earnings, after certain deductions, and the proceeds of the sales of the granted lands should be paid to the trustee for the fund for the benefit of the bondholders. The mortgage was duly recorded.

The railroad company accepted the grant and filed a map of its general route from Baton Rouge to Shreveport and a like map showing the general route from New Orleans to Baton Rouge. The lands were then withdrawn

from entry and sale by the order of the Secretary of the Interior. And under the terms of the grant the lands vested in the company, subject only to the construction of the road.

January 5, 1881, the Baton Rouge Company, by deed of quitclaim, conveyed the lands to the New Orleans Pacific Railroad Company, referred to herein as the New Orleans Company, and its successors and assigns, and thereafter the Baton Rouge Company no longer maintained its separate corporate existence and became merged and consolidated with the New Orleans Company.

The conveyance and acceptance were filed by the New Orleans Company in the Interior Department and the Secretary of the Interior, under an opinion of the Attorney General of the United States, recognized the New Orleans Company and that the Baton Rouge Company had title to the lands and could sell and assign the same.

On March 13, 1883, the Secretary of the Interior transmitted to the President a report of the examination of 260 miles of the road and recommended that they be accepted and that patents be issued for such lands as might have been earned by their construction by the New Orleans Company, as assignee of the Baton Rouge Company, the mortgagor thereof. The recommendation was approved and patents were issued to the New Orleans Company, but solely as the assignee of the Baton Rouge Company and as its grantee for 679,284.64 acres of lands in Louisiana. The foregoing state of facts in respect to the title of the lands was determined and adjudged in *New Orleans Pacific Ry. Co.* v. *United States*, 124 U. S. 124.

By an Act of Congress of February 8, 1887, c. 120, 24 Stat. 391, all lands which were not forfeited thereby were relinquished, granted, conveyed and confirmed to the New Orleans Company as assignee of Baton Rouge Company by the transfer above stated and title confirmed to

approximately 746,954 acres within the grant to the Baton Rouge Company. At this time the New Orleans Company was and now is consolidated with and merged into the Texas & Pacific Company.

Within six months after the conveyance to it by the Baton Rouge Company the New Orleans Company transferred all of its property to the Texas & Pacific Company, with the object and intention to merge the former with the latter under the latter's name. The land grant acquired by the former company was expressly reserved and its corporate organization was to be continued and maintained until further authorized corporate action. In addition to the lands patented to the amount of 679,284.64 acres to the New Orleans Company as assignee of the Baton Rouge Company, other lands have been patented to it amounting in 1917 to 1,001,000 acres, and the New Orleans Company has since procured further patents and filed applications for additional lands and still continues to do so. The records of the Secretary of the Interior show that there is a balance still due of more than 1,000,000 acres.

By the act incorporating the Texas & Pacific Company (1871) it was provided that the property and franchises acquired from each consolidated or purchased railroad company or companies should vest and become absolutely the property of the Texas & Pacific Company, subject, however, to all of the debts and obligations of the acquired company or companies, and that the consolidation should not impair any lien which might exist on any railroads so consolidated. It was provided that there should be no consolidation with any competing road and that the contracts and obligations of railroads consolidated should be liens upon the Texas & Pacific Company.

From about the time of the organization of the New Orleans Company, the Texas & Pacific Company con-

trolled it and still controls it, and by the recited acts and transfers became charged with the lien of the mortgage by the Baton Rouge Company to the Union Trust Company (September 4, 1872) and the other obligations of the New Orleans Company, particularly the performance of the covenants in the mortgage and the payment of the bonds secured thereby. The organization of the companies and merger in the Texas & Pacific Company and transfer of the lands granted were all a part of a scheme to secure from the United States the grant for the purpose of raising money thereon by mortgages, and bonds secured thereby, to construct and equip a transcontinental railway from New Orleans to the Pacific, as appears from the act incorporating the Texas & Pacific Company (Act of March 3, 1871).

The lands patented in the name of the New Orleans Company were appropriated by the Texas & Pacific Company, it continuing the other company in name for the sole purpose of receiving patents, and controlling its corporate books, accounts and records, the New Orleans Company maintaining no corporate existence and having no officers or directors (this on information and belief), and the Texas & Pacific, in violation of the terms of the covenants of the mortgage by the Baton Rouge Company to the Union Trust Company and the trust thereby created, has diverted the proceeds of the lands granted from the use and purpose of the mortgage and in fraud of complainants and the holders of bonds secured by the mortgage to its own use and to the use of the New Orleans Company and to other uses not authorized by the deed of trust. The persons to whom the sales of the lands have been made are so many that it is wholly impracticable to enforce the lien of the mortgage, and have by occupation under the color of title acquired an impregnable title thereto.

The Union Trust Company and certain bondholders

were made parties defendant in an action brought against the Baton Rouge Company by the trustees under deeds of trust of April 17, 1883, and January 5, 1884, executed by the New Orleans Company, to declare them first liens upon the lands described therein and to secure an issue of bonds authorized thereby, and asking for judgment that the deed of trust from the Baton Rouge Company to the Union Trust Company (September 4, 1872) did not affect or give any lien in or to the lands and that the same be canceled. A decree *pro confesso* was entered so declaring and adjudging.

The bondholders were dismissed from the case. The attorneys for the complainants were attorneys for the New Orleans Company and the Union Trust Company. There were false allegations in the bill and the Union Trust Company, though in duty bound as trustee to defend the action and the trust created by the mortgage, failed to do so, permitted the destruction of the lien and permitted the New Orleans Company and the Texas & Pacific Company to appropriate to themselves or to other purposes the proceeds of the sales of the lands which were at least worth $5.00 per acre.

The subject-matter of the suit exceeds $3,000 and the complainants are without remedy at law.

Discovery is prayed of the quantity of lands patented, the amount of sales and the proceeds thereof and that the Union Trust Company and the Texas & Pacific Company account to complainants and to all other bondholders similarly situated for all money and property received from the enjoyment and sales of the lands to the extent of their bonds and coupons and that they be adjudged to pay complainants the amounts found due them.

The answer of the Texas & Pacific Company qualified or denied certain of the averments of the bill and admitted others. It set up the various acts of Congress referred to in the bill and the transactions between the Texas &

Pacific Company and the New Orleans Company, but assigned a different cause and effect to them and to the acts of Congress and to what was done under them. Its defenses may be concentrated in four propositions stated by counsel:

"1. That the Baton Rouge Company never acquired title to the land grant lands, and that its alleged mortgage of September 4, 1872, never became operative as a lien thereon.

"2. That prosecution of the action is barred by the decree of the Circuit Court of the United States for the Eastern District of Louisiana in the suit of Dillon and Alexander against the New Orleans Pacific Railway Company and others.

"3. That the Texas and Pacific Railway Company is in no way connected with the land grant or the transactions referred to in the complaint.

"4. That the suit is barred by limitations and by the laches of the complainants."

Upon the issues thus formed, if it can be said there are issues upon anything else but the characterization and legal effect of the acts of Congress, the instruments referred to and the transactions detailed, the District Court expressed opinion that it was unable "to see how any express trust ever existed in plaintiff's favor or in favor of his decedent, except that created by the mortgage to the Union Trust Company as trustee, the bounds and limitations of which are set forth in the deed itself," which instrument, the court said, was "in effect nothing more or less than a mortgage, and to be treated as such." The mortgage and debt, therefore, the court said, might be enforced against the property at the *situs* of the latter, but by this suit, the court said further, it was sought to enforce the collection of the debt not from the property mortgaged but from another corporation now alleged to be personally liable for it. Such liability, the court

continued, could only result from some trust *ex delicto* to be implied from some state of fact shown, and not upon any direct undertaking by the New Orleans Company or the Texas & Pacific Company to pay the debt of another, to-wit, the Baton Rouge Company. Therefore, the court concluded that its decision must turn upon either one or both of the affirmative defenses made by the Texas & Pacific Company, that is, either the statute of limitations or laches, or both.

Reciting that the bonds matured September 4, 1902, and this suit was commenced May 7, 1913, the court finally applied the statute of limitations of ten years according to the law of New York and Louisiana. It, however, expressed the view that the defense of laches should be sustained and referred to *O'Brien* v. *Wheelock*, 184 U. S. 493, and dismissed the bill.

The Court of Appeals affirmed the District Court, but rested its decision upon the defense of laches, citing therefor *O'Brien* v. *Wheelock*, *supra*, and saying: "The proposition is somewhat startling that the holder of the obligations of one corporation secured by a mortgage on its property may maintain a suit forty years after the date of such obligation and based thereon against another corporation not a party thereto."

*Mr. Jesse C. Adkins*, with whom *Mr. David Bennett King, Mr. W. Russell Osborn, Mr. William A. Milliken, Mr. C. C. Calhoun* and *Mr. Daniel B. Henderson* were on the briefs, for appellants.

*Mr. Thomas J. Freeman* for appellee.

MR. JUSTICE MCKENNA, after stating the case as above, delivered the opinion of the court.

To establish a trust against the Texas & Pacific Company it is argued that the purpose of the Act of Congress

of 1871 was to provide for the construction of a transcontinental railroad from Texas to San Diego, California, and from thence to San Francisco by another company, and that the Baton Rouge Company, the New Orleans Company and principally the Texas & Pacific Company were instruments of that purpose; and the grant of the Baton Rouge Company, by its mortgage to the Union Trust Company, became charged with a lien for the payment of the bonds issued by the railroad company, which lien followed the conveyance of the lands to the New Orleans Company and to the Texas & Pacific Company; and that besides there was a personal trust first in the Union Trust Company and successively in the other companies. And the argument is attempted to be fortified by § 4 of the Act of Congress of 1871 which authorized the Texas & Pacific Company to acquire other railroad corporations, and § 6, by which it was to become responsible for the debts or obligations of any company so acquired.

To sustain this contention the provisions of the various instruments are adduced and their requirements, especially that the bonds were entitled to the benefit and security of a sinking fund to be set apart for their redemption whereby the proceeds of all lands granted to the railroad company (the Baton Rouge Company) were to be applied to the payment of interest on the bonds and to their redemption and also 1% of the gross earnings of the company. And that the railroad and its equipment were mortgaged for like purposes and all "the lands and sections of lands situate, lying and being on either side of the said railroad, as the same may be finally located and constructed, in accordance with and as granted by the act of Congress" of March 3, 1871.

The mortgage to the Union Trust Company was in trust for the purposes expressed above, and it was provided that, if default should be made in payment of inter-

est or of any payment to the sinking fund and continue
for the period of six months, or in default of any require-
ment of the mortgage, all of the bonds outstanding, at
the option of the holders of a majority in interest of such
outstanding bonds, should forthwith become due and
payable. And further, upon written request of the holders
of at least 1000 bonds then outstanding, the trustee should
foreclose the equity of redemption of the property em-
braced in the hypothecation; and at the request of a
bondholder might take possession of the road.

Sales of the lands were provided for and the disposition
of the proceeds, any balance remaining to be appropriated
to the purpose of the sinking fund. There was a covenant
by the company to pay on June 1, 1880, and on the first
of June of each succeeding year, a sum which should equal
one percentum of the gross earnings received by the road
from its operation twelve months immediately preceding,
which sum should be applied by the Trust Company or
its successors to the redemption of the bonds, and that
the Trust Company on the first days of January and July
of each and every year should designate by lot for re-
demption a number of bonds sufficient to equal, as near
as might be, the accumulations of the sinking fund and
cause a notice to be printed of such purpose.

It is contended that by reason of these provisions and
the facts detailed a trust was created that followed the
lands to whosesoever hands they reached, and each pos-
sessor of them became a trustee and bound with respect
to the property to the execution of the trust in the same
manner as the original trustee, the Union Trust Company,
was, citing for this result *Ketchum* v. *City of St. Louis*,
101 U. S. 306.

And by virtue of this principle the New Orleans Com-
pany is declared to have been a trustee and the lands
granted to it subject to the execution of the trust and the
Texas & Pacific Company has also become a trustee.

Another ground of liability is asserted against the latter company. It has been consolidated, the contention is, with the New Orleans Company and the latter has disappeared from sight and significance, leaving the Texas & Pacific in sole responsibility. And yet the instrument of consolidation expressly excepts "the lands and the land grants acquired or to be acquired" by the New Orleans Company from the United States, the State of Louisiana or the Baton Rouge Company, or from any other source, other than lands necessary or needful for railway purposes. There is an express exemption and exclusion of such from the provisions of the instrument of consolidation. And it was provided that the corporate existence of the New Orleans Company should be maintained and its power to carry out the existing contracts and to mortgage any land grant it had acquired or might acquire from the Baton Rouge Company or otherwise should remain unimpaired.

There is, therefore, some ground for the contention of the Texas & Pacific Company that there is a want of that privity of property which, according to the insistence of appellant, is necessary to make that company trustee of the Baton Rouge Company's mortgage of 1872, and that §§ 4 and 6 of the act incorporating the Texas & Pacific Company have not the meaning ascribed to them. And further that the Baton Rouge Company never acquired any lands to which a lien could attach and that the asserted trust had nothing upon which it could be exercised, neither lands to sell nor railroad to take possession of and operate, both of which—sale of lands and operation of road—were necessary to the execution of the trust; and that it was so determined in a suit against proper parties by the decree of the Circuit Court of the United States for the Eastern District of Louisiana.

To this contention complainants reply: (1) The decree was collusively obtained, (2) It did not cover the right

of way and roadbed which, it is said, is admitted to have
come to the Texas and Pacific Company from the New
Orleans Company, (3) Independently of the deed of trust
and irrespective of it, the arrangement between those
companies was an attempt to conserve the subordinate
rights and interests of the stockholders of the Baton
Rouge Company at the expense of its creditors; an at-
tempt, it is insisted, always judicially condemned. Cases
are cited, among others, *Northern Pacific Ry. Co.* v. *Boyd*,
228 U. S. 482.

· The argument to sustain or oppose the respective con-
tentions we need not recite. They have indication in the
pleadings and, it may be, in what we have already said.
We rest our decision on the defense of laches which, we
think, has been sustained.

In 1872 the Baton Rouge Company executed the instru-
ment the particular trusts of which are now attempted
to be enforced. Before that time it had filed a map of
general route but no map of definite location; but after
that time the record discloses nothing done by it until
1881, when it conveyed the lands to the New Orleans
Company.

The activities of the New Orleans Company are shown,
and through and by what struggles it was enabled to
construct the road. The record shows assertion of rights
by some of the bondholders, but also shows that the asser-
tion was met by challenge of legality and judicially de-
termined against. During all that time, during all of
the notoriety of the transactions detailed, the owner or
owners of the bonds in suit made no claim by word or
act and now, over ten years after their maturity and
forty years after their issue, a claim of personal liability
is made against the Texas & Pacific Company. It is to
be borne in mind that the interest on the bonds has al-
ways been in default, certainly since 1876, and there was
remedy provided for such default. At the instance of

any holder of the bonds the trustee could have taken possession of the road and if of the Baton Rouge Road then of its successors in liability, the New Orleans and the Texas & Pacific companies, for if they were successors in liability they were successively subject to the remedy. If it be said that such remedy was extreme and inconvenient, it had potency as a threat in the hands of a diligent creditor, and, besides, if there was a successive personal liability it accrued against the New Orleans Company in 1881 and the Texas & Pacific Company in 1881.

The delay is attempted to be excused. It is said action for nonpayment of interest could only be taken by the holders of 1000 or a majority of bonds outstanding, and that it appears the Texas & Pacific Company had acquired 1183 of the 1275 bonds which were outstanding. It is hence contended that complainants' testate could not have been guilty of laches before his death and that the present complainants could not act until the maturity of the bonds in 1902. It is further said that complainants filed a bill in 1908 in the United States District Court in Louisiana to collect the bonds and that until the filing of the answer in that case complainants were ignorant of the merger of the New Orleans and the Texas & Pacific companies or of the suit filed in 1890 to remove the cloud of the asserted lien of the mortgage of the Baton Rouge Company to the Union Trust Company of 1872.

But what complainants' testate knew does not appear and whether he was an original holder or a purchaser, except that it was thought he owned the bonds for seven or eight years before his death. And the ignorance of complainants is extraordinary in view of their interest, if it was an attentive interest. If we may suppose ignorance of records we cannot suppose, certainly not indulge, an ignorance of the open activities of the companies and the possession and operation of the railroad by the Texas & Pacific Company.

It is again said in excue that it does not appear that the Texas & Pacific Company has changed its position, which it is said is the same as it was in 1881, and that it has even realized the benefit of the trust and so far executed it as to pay before 1890 most of the bonds. Why those bonds were paid or acquired and upon what motive does not appear, and it cannot be said that a company which has been in possession of and operating a great property for many years, having spent large sums of money upon it, in the belief of having a clear and unincumbered right, is inequitably unaffected by a claim against it, asserted as a result of remote transactions with which it had no connection. And certainly it may be urged that it would surprise and strain any condition to be suddenly called upon to pay $107,700.00, that sum being the amount of principal and interest (7%) of complainants' demand.

*Decree affirmed.*