UNITED STATES & MEXICAN TRUST CO. v. UNITED STATES &
MEXICAN TRUST CO., as Trustee, et al.

WATSON et al. v. SAME.

(Circuit Court of Appeals, Eighth Circuit.  April 3, 1918.)

Nos. 4955, 4956.

**1. RAILROADS ⟨⟩195(3)—FORECLOSURE SALE—DEPOSIT OF BONDS BY PURCHASING COMMITTEE.**

A holder of railroad bonds, who deposited them subject to the orders of a reorganization committee pending foreclosure proceedings, *held* not entitled to withdraw them after the suit had gone to decree, the property had been sold and bought by the committee, and the bonds had been deposited with the court to be used in making payment of the purchase price.

**2. RAILROADS ⟨⟩195(1)—REORGANIZATION THROUGH FORECLOSURE PROCEEDINGS—POWERS OF COURT.**

It is much the better practice for a railroad reorganization committee to formulate its plan of reorganization before final decree and sale of the property, that the bondholders may know, while a choice might be of value, how they would fare by accepting or rejecting it, and while the court in charge of the case may hear objections of those dissenting, and afford them such relief as equity may require, which it has the power to do.

**3. RAILROADS ⟨⟩169—MORTGAGES—DUTY OF TRUSTEE.**

The trustee in a railroad mortgage owes the duty of giving its personal service to the bondholders as a class, without partiality or discrimination; and in the absence of provision therefor in the mortgage it is a breach of such duty to permit a committee not representing all the bondholders to control foreclosure proceedings and select counsel for the trustee.

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Suit in equity by the United States & Mexican Trust Company, Trustee, and others, against the Kansas City, Mexico & Orient Railway Company and others. The United States & Mexican Trust Company, petitioner and intervener, and Mary E. Watson and others, interveners, separately appeal from certain orders of the District Court. Modified on appeal of Trust Company, and otherwise affirmed.

John G. Park and John H. Atwood, both of Kansas City, Mo., for appellants.

Dudley W. Eaton and Charles W. German, both of Kansas City, Mo. (Hyden J. Eaton, of Kansas City, Mo., on the brief), for appellee Kansas City, M. & O. R. Co.

Before HOOK, CARLAND, and STONE, Circuit Judges.

HOOK, Circuit Judge. This is an appeal in a railroad foreclosure suit from two orders, one of which denied the trustee in the mortgage the right to substitute counsel of its own selection for those it had allowed a bondholders' committee to name, and the other denied the application of certain bondholders to withdraw their bonds from the custody of the clerk of the court, where they had been deposited as

part payment for the railroad sold under the decree of foreclosure. Only enough of the voluminous history of the litigation will be stated to disclose the questions presented to us.

The Kansas City, Mexico & Orient Railway Company was organized to construct and acquire a railroad from Kansas City, Mo., to the Gulf of California, in the United States of Mexico, a distance of about 1,600 miles. On February 1, 1901, it executed a mortgage to the United States & Mexican Trust Company, as trustee, to secure its first mortgage bonds to be issued from time to time as the railroad was completed or acquired. By March 7, 1912, it had by direct and indirect ownership in Kansas, Oklahoma, Texas, and Mexico 859 miles of main line railroad and 102 miles of yard and terminal tracks, and had issued bonds aggregating $24,538,000. At that time the railway company had become insolvent, the trust company and some other creditors filed a creditors' bill, and receivers were appointed by the trial court. About that time certain men organized themselves into a committee, and on March 12, 1912, promulgated a "bondholders' deposit agreement," wherein they invited the bondholders of the railway company to deposit their holdings with designated financial institutions, to be held subject to the control of the committee who thereby undertook to reorganize the railroad. Under this deposit agreement the powers of the committee over the bonds deposited were as broad as language could make them, restrained only by the essential relation of trust to the depositing bondholders and the principles of law applicable thereto. The amount of bonds deposited under the agreement is variously shown as having been from $20,343,848 to $20,999,121. The deposit agreement contemplated that the committee should adopt and publish a plan or plans of reorganization. It provided that a plan proposed might be defeated by the dissent of the holders of 30 per cent. of the amount of the deposited bonds and that, if so defeated, the committee might try again; but if, within 2 years, the committee did not do so, or did not put forth another plan that became effective, any bondholder might within 30 days thereafter withdraw from the agreement. On March 19, 1912, the board of directors of the trust company adopted a resolution that it desired to remain and continue as trustee under the mortgage, and to that end it proposed to the committee to conduct its trust in a manner satisfactory to them in all things, and to allow the committee to appoint its agents or counsel to represent it in all litigation. This action was doubtless due to provisions of the mortgage that three-fourths in interest of the bondholders might remove the trustee and appoint another, and to the fact that the committee had, or would probably have, control of that proportion of the bonds. Later a bill for the foreclosure of the mortgage was filed by counsel for the trust company as trustee. The attention of the trust company was called to its resolution of March 12th, with the result that its counsel withdrew from the case and counsel named by the committee were substituted by order of the court. February 2, 1914, a decree of foreclosure was entered. On July 6, 1914, a special master sold the railroad for $6,000,-000, through a purchasing committee, to the Kansas City, Mexico &

Orient *Railroad* Company, which the committee caused to be organized that day under the laws of Kansas.  July 6, 1914, the sale was confirmed, deeds were executed, and the railroad was turned over to the new company.  It may be noted here that no plan of reorganization had yet been proposed by the committee.

On July 7, 1914, the new railroad company applied to the Public Utilities Commission of Kansas for authority to issue $31,000,000 of mortgage bonds and $20,000,000 of common stock, representing that it had acquired the property of the old company from the purchasers at foreclosure sale, and that the new "bonds and stock were to be issued in payment of the purchase price and to be immediately pledged to secure an issue of $6,000,000 of gold notes of the [new] company." The estimated value of the railroad property was alleged to be $25,-000,000.  July 15, 1914, the Commission found the statements in the application to be true, and authorized the issue of the new bonds and stock to the amounts named, only, however, for the purpose of pledge as security for the $6,000,000 of gold notes of the new company, and the Commission provided that when those notes were paid, and the pledged securities were released, the latter should not be used for any other purpose without its further order.  The new company issued $6,000,000 of two-year 6 per cent. gold notes, and also the $31,000,000 of bonds and $20,000,000 of stock authorized by the Commission.  The bonds and stock, except a few directors' qualifying shares of the latter, were deposited as security for the gold notes under a collateral trust indenture dated July 15, 1914.  The effect of this was to secure the gold notes by a first lien upon the entire railroad property.  Of these gold notes $5,640,200 were issued and sold "largely to the holders of bonds of the old company."  At the hearing before us it was stated by counsel for the appellees that an opportunity to subscribe for the notes was given all the old bondholders; but the fact does not appear in the record.  It was evidently the intention of the committee who directed all the transactions to use the proceeds of the notes, or as much thereof as might be needed, to perfect the purchase of the railroad for the new company at the foreclosure sale.  In the matter of the purchase there were also delivered to the special master certificates from the depositaries under the "bondholders' deposit agreement" that they held subject to his order $20,343,848 of bonds of the old company.  That amount included the bonds of the appellants.  November 12, 1915, the new railroad company filed in court a report of its payments or disposition of the purchase price at the foreclosure sale. The report showed several printed pages of items paid, some of which, like receivers' certificates, receivers' notes, etc., were manifestly superior to the old mortgage bonds, and many others appeared on their face to be of a character that might be so superior.  It also contained a statement of undisposed interventions and claims to priority, in large amount.  The trial court afterwards allowed but part of the items, reported as paid, as a credit on the purchase price.  Reference will presently be made to its order on that subject.

On December 8, 1915, the committee promulgated a plan of reorganization.  The estimated cash requirements were $15,003,600.  This

was to be raised in part by the payment by the bondholders of $600 on
each $1,000 bond deposited with the committee, for which payment
they were to receive a new mortgage bond for the amount paid, also
$1,000 of preferred stock, and a like amount of common stock of the
new railroad company; the stocks of both kinds to be held in a voting
trust. The stock and bonds already issued under the authority of the
Commission and pledged for the gold notes were to be replaced by the
new issues of the railroad company upon the retirement of the notes.
Application was made February 8, 1916, by the new company to the
Public Utilities Commission for authority to issue stocks and bonds
as contemplated by the plan. It recited an actual cash investment in
the railroad of $28,159,258. The application does not appear to have
been acted upon. The plan of reorganization failed of adoption by
the old bondholders and no other plan was proposed by the committee.

On July 1, 1916, the trial court allowed as a credit upon the purchase
price of $6,000,000 at the foreclosure sale only items of receivers' cer-
tificates and receivers' other obligations aggregating $2,850,087.15, and
ordered the purchaser (the new company) to pay the balance of $3,149,-
912.85 into court by October 9, 1916. It also ordered that, if the bal-
ance should be credited upon the old outstanding mortgage bonds, the
bonds should be produced in court at that time, so that the credit might
be indorsed. Before this order was complied with the trust company,
as trustee, demanded of the committee the right to substitute counsel
of its own selection in the foreclosure suit, and it and the other appel-
lants also demanded the return of their bonds for failure of the com-
mittee to comply with the deposit agreement. Failing in both endeav-
ors, they applied to the trial court by motion and petitions in the fore-
closure suit for the relief, and also to prevent the application of their
bonds on the purchase price of the railroad. The court sustained the
motion for substitution of counsel, so far as concerned bonds owned
by the trust company or held by it as trustee for others, but denied
it as to its trusteeship in the mortgage and its representation by counsel
in the foreclosure suit. With some exceptions not material here, the
court denied the petitions for the withdrawal of the appellants' bonds,
and ordered that they be applied, with the others, on the purchase of
the railroad. These two orders are the subject of the present appeals.

The new railroad company, being furnished therewith by the com-
mittee, delivered the bonds deposited with the latter under the deposit
agreement, including those of the appellants, to the clerk of the court
for credit of the due percentage of the purchase price of the railroad
at the foreclosure sale. Except what may be imported by this credit,
the bondholders of the old company have never received anything on
their investment. Neither the committee nor the individual members
are parties to this litigation, nor do they appear to have submitted
themselves to the jurisdiction of the trial court. It appeared at the
hearing before us that they had practically abandoned all efforts at re-
organization; also that the new company had defaulted on its gold
notes, that a suit was pending for the foreclosure of the collateral
trust indenture securing the notes, and that appellants and other old
bondholders, except those owning the notes, were in danger of losing
all interest in the railroad.

[1] We perceive no defect in the title of the new company to the railroad property. The foreclosure proceedings in the trial court and the organization and constitution of that company as a purchaser appear regular. Further, the case had proceeded so far without withdrawal or effort to withdraw appellants' bonds from the committee, and without objection or remonstrance against what was being done, that, under the terms of the deposit agreement, the bonds became irretrievably subject to use on the purchase price. They had been voluntarily committed to that purpose, among others, by the appellants, and the condition or emergency had arisen. It would not have been equitable to other bondholders to have allowed them to withdraw at the last moment; and, though an attack upon the gold notes of the new company and the lien securing them would require the presence of the trustee in the collateral trust indenture, we think we should also say that we see no flaw in them. It was contended at the hearing that the committee controlled the disbursement of the proceeds of the notes and had improperly used part of them. That could only be considered in a case to which the committee were parties. We do not, however, think any inference on the subject necessarily arises from the court's order confining the new company's credits on the purchase price of the railroad to the payments of receivers' certificates and obligations. For example, no just complaint could be made by the bondholders of payments by the committee from the proceeds of the notes, of claims that were in fact superior in equity to the lien of the old bonds though not then formally allowed as such by the court. The rights of the bondholders would not be clear until such claims were discharged, and it was entirely proper for the committee or the new company to discharge them with any available funds raised on the property.

[2] It is much the better practice for a reorganization committee to formulate their plan for reorganization before the final decree and sale. That course enables the security holders to know, while a choice might be of value, how they would fare by accepting or rejecting it, and it gives the court in charge of the case an opportunity to hear the objections of those dissenting, and to afford them such relief as equity may require. It is no longer the rule that a court has nothing to do with the reorganization of a railroad that is to be consummated through its judicial processes, or that it is powerless to prevent injustice. The failure to observe that course in the case here, the absence of a definite project, may well have deterred bondholders from agreeing to subscribe for the gold notes, which, it is said, are now in process of enforcement. But, however this may all be, the power conferred upon the committee was broad enough to cover what they did.

As matters now stand, the title to the railroad is vested in the new company. The execution and pledge by that company of its bonds and stock under the order of the Public Utilities Commission is in effect a mortgage of the railroad to secure the $6,000,000 of gold notes, or such of them as have been issued and sold. When the gold notes have been discharged, the pledged provisional securities become without office or function, save upon the further order of the Commission. The owners of the bonds of the old company, who deposited their hold-

ings with the committee, or of the certificates of deposit issued thereon, are in equity the owners of the railroad, subject to the gold notes and to such claims as may be adjudged prior or superior in lien or equity. The relinquishment of the bonds by the committee, and the fact, if it be one, that they have abandoned the effort at reorganization, leave the field free for the owners to make further attempts to save their equity, and to invoke the assistance of the trial court to that end. That the bonds are held by the clerk of the court is not an obstacle; their equitable interest is unconfined.

[3] The trust company surrendered its right to select its own counsel to represent it in the foreclosure suit, in order that it might retain its position as trustee and receive the compensation thereof. It should not have done so. The trustee in such a mortgage, except where otherwise expressly provided in the plainest terms, is the representative of all the bondholders, regardless of their assent or dissent in matters of reorganization, and the foreclosure suit should be conducted by it impartially for the benefit of all. As was said in Commonwealth v. Railroad, 122 Pa. 306, 320, 15 Atl. 448, 450 (1 L. R. A. 225):

"'The bonded debt is a unit, so far as his duties and powers are concerned. He must regard the bondholders as a class, and not as individuals. He cannot permit, and, if so wanting in fidelity to his trust as to be willing, the courts will not permit, the least discrimination between members of the same creditor class."

The foreclosure suit was otherwise conducted in the regular way, the rights of the bondholders were not prejudiced, and the title of the new company is valid. But, whatever other powers or duties remain for the trust company as trustee, whether in the foreclosure suit or elsewhere, it should be left free to exercise or perform through agents or counsel of its own selection. The order, upon the motion of the trust company for substitution of its counsel as trustee, is modified, by sustaining it, excepting that the right to attack the mortgage foreclosure and sale is denied, and, as so modified, the order is affirmed. The order denying appellants' petitions for the withdrawal of their bonds, and directing their application on the purchase price at the foreclosure sale, is affirmed.