WARNER BROS. PICTURES, Inc., et al. v. LAWTON–BYRNE–BRUNER INS. AGENCY CO. et al. (two cases).

Nos. 10272, 10273.

Circuit Court of Appeals, Eighth Circuit.

Oct. 31, 1935.

George W. Morgan, of St. Paul, Minn., and Arthur E. Simpson, of St. Louis, Mo. (Kellogg, Morgan, Chase, Carter & Headley, of St. Paul, Minn., Defrees, Buckingham, Jones & Hoffman, of Chicago, Ill., and Jeffries, Simpson & Plummer, of St. Louis, Mo., on the brief), for appellants.

I. E. Ferguson and David Levinson, both of Chicago, Ill. (Joseph H. Grand, Jacob Chasnoff, and F. H. Sullivan, all of St. Louis, Mo., and A. Fishman, of Chicago, Ill., on the brief), for appellees.

Joseph H. Grand, Frank H. Sullivan, William O. Reeder, Ralph T. Finley, and Hugh H. Sullivan, all of St. Louis, Mo., for Ambassador Building Corporation and Missouri Building Corporation.

Before STONE and FARIS, Circuit Judges, and RAGON, District Judge.

STONE, Circuit Judge.

On April 20, 1925, the Central Properties Corporation made its deed of trust and chattel mortgage to secure bonds of the par value of $4,500,000. The deed of trust covered two tracts of land and buildings thereon in St. Louis, Mo.—called herein, respectively, the Grand Central and the Ambassador properties. The Ambassador property consisted of a 17-story downtown office building containing a large (3,000 seats) moving picture theater—the building being on two adjoining tracts of land of which one was owned and the other under 99-year lease expiring in 2006. The Grand Central property consisted of a 2-story moving picture theater building (1,700 seats) outside the downtown district—the building being on two adjoining tracts of land held under separate 99-year leases, both expiring in 2011. This deed of trust and chattel mortgage were a first lien on the property.

On January 15, 1928, the St. Louis Properties Corporation made its deed of trust and chattel mortgage to secure bonds of the par value of $2,000,000. The deed of trust covered a building and tract of land in St. Louis—sometimes called herein the Missouri property. This consisted of a 12-story office building containing a large (3,800 seats) moving picture theater on a tract owned by the company located outside the downtown district.

After the St. Louis Properties Corporation had acquired the above property of the Central Properties Corporation, it made two successive deeds of trust covering all of the above properties. The first of these was executed January 15, 1928, to secure par bonds for $850,000 and created a second lien on all the above three properties. The second was executed on February 1, 1928, to secure par bonds for $1,000,000 and created a third lien on the three properties.

The business of the St. Louis Properties Corporation was the management of these two office buildings and these three theaters.

August 19, 1932, a creditor's bill was filed, against the St. Louis Properties Corporation; it answered confessing the allegations of the bill, and a receiver for all of the above properties was appointed and thereafter qualified. Later, foreclosure bills were filed under each of the two above first mortgages and the second mortgage; these were consolidated with the creditor's suit and the receivership extended to cover the four consolidated actions. On December 28, 1933, foreclosure decrees were entered covering the two first mortgages and ordering sales thereunder.

Among the provisions of each of these decrees were the following: That bidders must qualify by depositing with the master conducting the sale a specified amount of cash or of bonds under the mortgage covered by the sale; that the successful bidder might (beyond certain cash payments to cover costs, expenses, etc., of the foreclosure) make payment for the property in bonds covered by the particular mortgage; that, if the property was to be bid in for reorganization, the plan of reorganization must be filed, objections might be filed thereto, and the court would determine the fairness of any plan; that jurisdiction was reserved "to enter a personal deficiency decree against the defendants, or any or either of them, who may be personally liable therefor."

On March 26, 1934, a bondholders' committee under the two first mortgages and a similar committee under the second mortgage asked leave to intervene claiming deposits of bonds as follows: About 75 per cent. under Central Properties first mortgage; about 68 per cent. under St. Louis Properties first mortgage; and about 80 per cent. under St. Louis Properties second mortgage. The application for leave ends:

"Your petitioners attach hereto a petition for instructions and directions which they desire to file in this proceeding, and respectfully pray that the Court enter an order herein granting them leave to intervene for the purposes set forth in said petition."

But this petition is not in the record.

On March 30, 1934, Warner Bros. Pictures, Inc., asked leave to intervene by a petition attached thereto. This petition set out that it had (March 8, 1934) submitted to the committee representing the two first mortgages bonds plans covering "refinancing" of the property under each of the mortgages (copies being attached to the petition), but that, "notwithstanding the submission of said plans," the committee had (on March 22, 1934) mailed to its bond depositors "notices of the adoption and filing of plans of reorganization * * * and a summary of such plans showing plans entirely different from those submitted by this intervener" and without informing such bondholders that intervener had submitted plans or that any plans other than submitted by the committee were available to the bondholders; that intervener's said plans were of substantial merit and, if submitted to the depositing bondholders, would be largely approved by them; that, in denying such bondholders the opportunity to choose between such plans, the committee was acting "in a manner prejudicial to the best interests" of such bondholders. The prayer of the petition was for disapproval of the committee plan, for rescission of the committee proposal for ratification until the plan had been approved by the court, for approval of the plans submitted by intervener, for instructions to the committee to forego sending any plan to any bondholder "without the consent of the court," and for general relief.

On April 2, 1934, Mrs. F. Geller and other individuals asked leave to intervene. Nine were separate holders of various amounts (a total of $138,400) of Central Properties first mortgage bonds on deposit with the committee of which T. J. Martin held $104,000; one (T. J. Martin) was holder of an undisclosed amount of St. Louis Properties first mortgage bonds on deposit with the committee; and another (Philip J. Raff) held $36,200 of Central Properties first mortgage bonds not deposited and $27,000 of St. Louis Properties first mortgage bonds not deposited. The Martin and Raff holdings were as agents of Warner Bros. Pictures, Inc. Petitioners desired to intervene to protect their interests in any reorganization plan and to oppose the committee plan. The attached proposed intervening petition set out numerous objections to the committee plans.

On April 23, 1934, the court denied the above applications to intervene by Warner Bros. Pictures, Inc., and by Mrs. Geller et al. on the grounds that they were premature and presented matters which the court

would, at the proper time, consider without such interventions. May 1, 1934, an order was made requiring the committees for the two First Mortgages Bonds to send summaries of their plans to all first mortgages bondholders known to them and to extend deposit date with committees to May 20.

June 7, 1934, sales were held under the two above foreclosure decrees. The properties under both sales were bought by Thomas N. Dysart for the respective First Mortgage Committees. The following day he filed (in compliance with the foreclosure decrees) separate reorganization plans for the properties bought under each sale. The same day, the master filed his reports on the sales. In the report of sale under the Central Properties mortgage, he stated that the only bidders qualifying were Thomas N. Dysart (acting for the bondholders' committee of that mortgage) and Sam B. Jeffries, and that the only bids were $1,000,000 by Mr. Jeffries and $1,400,000 by Mr. Dysart. In the report of sale under the St. Louis Properties mortgage, he stated Mr. Dysart was the only person qualifying as bidder and that he bid $600,000. June 11, 1934, each of the committees under the two above mortgages filed separate petitions for confirmation of sale and, on that day, an order was entered fixing July 3, 1934, as the date to hear the petitions to confirm and to determine the fairness of the two plans of reorganization presented by the committees and prescribing and directing notice thereof by the committees.

On July 2, 1934, various petitions objecting to confirmation of the sales and to approval of the plans of reorganization were filed. As to the Central Properties foreclosure, such objections were filed (1) by David Berger, Esther Berger Epstein, and Joseph Berger (holding $11,500 of undeposited Central Properties first mortgage bonds); (2) by Warner Bros. Pictures, Inc. (holder of $141,100 of undeposited Central Properties first mortgage bonds, of 69,994 shares [92 per cent.] of Skouras Bros. Enterprises, Inc., which owned all the stock of Central Properties Corporation which [in turn] owned all of the bonds [par $1,000,000] under the third mortgage on all these properties)—this petition had attached a proposed plan of reorganization—; (3) by Sam B. Jeffries (trustee under the above third deed of trust); and (4) by Theodore Berger and Henry Silver (holders, respectively, of committee certificates of deposit for $1,000 and $2,500 of Central Properties first mortgage bonds). As to the St. Louis Properties foreclosure, such objections were filed (1) by Warner Bros. Pictures, Inc. (holder of deposited [$500] and undeposited [$29,600] of St. Louis Properties first mortgage bonds, of $154,800 St. Louis Properties second mortgage bonds, and of the Skouras stock as above); (2) by Sam B. Jeffries as trustee under the third deed of trust.

Hearings were had (July 3 and 5) on the confirmations, the plans, and the objections, evidence introduced and (on July 5, 1934) the court entered two orders (one in each sale) confirming the sales, approving the plans of reorganization presented by the committees, and entering deficiency decrees. October 2, 1934, Warner Bros. Pictures, Inc., David Berger, Esther Berger Epstein, Joseph Berger, Theodore Berger, and Henry Silver brought a joint appeal from the above order in the Central Properties sale. The same day, Warner Bros. Pictures, Inc., brought its separate appeal from the above order in the St. Louis Properties sale. Both appeals are here on a joint record. The issues of law here being the same in both appeals, the presentation has been on single briefs. Since these appeals were perfected, David Berger, Esther Berger Epstein, and Joseph Berger have filed a joint motion to dismiss the appeal as to each of them. This motion is granted thus leaving that appeal (our No. 10272) as being by Warner Bros. Pictures, Inc., Theodore Berger, and Henry Silver.

Each of the two decrees acted upon three matters: The plan of reorganization, the adequacy of the successful bids, and deficiency decrees. Each of these is an issue in one or both of the appeals. In presenting their challenge to the decrees along the lines of these three issues, appellants' first attack is that the bids were entirely inadequate. Their second contention is that, even if the bids be adequate, there are various objections to the plans of reorganization which should have led to rejection of them. The third contention relates to the deficiency decrees and is double barrelled: First, that the court had no jurisdiction to enter deficiency decrees; second, that if jurisdiction existed, yet the bids were so grossly inadequate that no deficiency decree should have been entered, but the court should have ordered either a resale or a confirmation on condition that the bidder consent to a determination of the value

of the property and of the amount of deficiency, if any, beyond such value.

Appellees challenge the right of any of the appellants to complain of either the alleged inadequacy of the bids or the deficiency decrees. Naturally, if any appellant is in position to challenge either of those matters, such becomes an issue we must resolve. Their position in this respect must first be determined. As to the Central Properties decree, the remaining appellants are Theodore Berger, Henry Silver, and Warner Bros. Pictures, Inc. Berger and Silver appear as holders of certificates (for deposited bonds) issued by the committee for the Central Properties first mortgage bonds, for which committee the property was bought in at the sale. Warner Bros. Pictures, Inc., appears as holder of undeposited bonds under the same mortgage and as owner of 92 per cent. of the stock of Skouras Bros. Enterprises, Inc., which, in turn, owned all of the capital stock of Central Properties Corporation (maker of this mortgage) which, in turn, owned all of the bonds under the third mortgage. As to the St. Louis Properties decree, Warner Bros. Pictures, Inc., appears as the holder of both deposited and undeposited bonds under that mortgage, of St. Louis second mortgage bonds and of the above Skouras stock.

In the above position, Berger and Silver are clearly not entitled to question either the adequacy of the bid or the entry of a deficiency decree. As to the bid, this is true because if the bid was inadequate it resulted in a benefit to them, as participators in the reorganization, since it would result in less expense to such reorganization by reducing the cash to be furnished by the committee to provide for nonparticipants. As to the deficiency decree, it is obvious that, the reorganization having procured the entire property, the larger a deficiency decree the better for all of such participating bondholders.

As to Warner Bros. Pictures, Inc., the situation requires further consideration because it is not only a holder of deposited bonds under the St. Louis Properties foreclosure, but also of undeposited bonds under both of the foreclosed mortgages, of bonds under the second St. Louis mortgage, and of Skouras stock. As holder of undeposited bonds under the two foreclosed mortgages, it is interested in an adequate bid because it may wish to take its propor-

tion of cash instead of joining in the reorganization. Therefore, it is in position to challenge the adequacy of the bid.

As to the position of that company in respect to a challenge of the deficiency decree, the situation is as follows: No one can challenge the action of a court unless he be adversely affected thereby. As holder of bonds under any of the three issues held by it, it cannot be adversely affected: First, because all of the property covered by any of these mortgages was sold under the foreclosure decrees, and, second, because the deficiency decrees were not against it. The deficiency decrees were against Central Properties Corporation and St. Louis Properties Corporation in the Central Properties foreclosure and against St. Louis Properties Corporation in the St. Louis Properties foreclosure. Only those companies (or possibly unsecured creditors thereof) could challenge the deficiency decree because only such could be injuriously affected thereby. Warner Bros. Pictures, Inc., is the owner of 92 per cent. of the capital stock of Skouras Bros. Enterprises, Inc., which (in turn) was a guarantor of the bonds under the foreclosed mortgages and also was owner of all the capital stock of Central Properties Corporation (which made that mortgage and against which deficiency decree was entered in that foreclosure). No deficiency decree was entered against Skouras Bros. Enterprises, Inc., on its guaranty or otherwise, therefore, that company (even if it were here objecting in its corporate capacity) has no standing to object based on its liability as guarantor. If it has any standing, it would be as holder of all the capital stock of Central Properties Corporation. But Central Properties Corporation is a party to this action, and neither is it objecting here nor has any of its stockholders shown or even alleged that the constituted officials of such company will not protect its interests and therefore it is necessary for the stockholders to be allowed to do so. In this situation, Skouras Bros. Enterprises, Inc., would be in no position to object to the deficiency decree against Central Properties Corporation. Much less so is Warner Bros. Pictures, Inc., which is even further removed, being only holder of stock in Skouras and, therefore, only indirectly and partially an owner of Central Properties Corporation stock.

The result of the above examination is that Warner Bros. Pictures, Inc., is the only

appellant in position to challenge the adequacy of the bids and that it is not in position to challenge the deficiency decrees. This leaves the broad issues here as, first, the adequacy of the bids, and, second, the fairness of the plans of reorganization.

### Adequacy of Bids.

The contention of appellant Warner Bros. Pictures, Inc., on this issue is as follows: Since these foreclosure sales were simply steps in reorganization, they are merely devices for passing title and cannot be deemed to have determined the value of the property sold; that the bidding was "chilled" by inclusion, in the plans of reorganization, of the bonds deposited under the second mortgage; and that the value of the property sold exceeded the amount of the indebtedness under the foreclosed mortgages. Before treating the facts as to the bids, it is advisable to state the applicable law.

Reorganization of distressed corporations is primarily and principally a business (economic) problem. It is a means whereby those variously interested financially in a distressed business seek, through continuance of that business as a going concern, to work out for themselves more than they could gain by sale of the assets or of the business to others. Reorganization is occasioned by the situation that the business cannot go on as it is. If it is to continue in control of all or of some of those financially interested in it, a readjustment is necessary. Such readjustment involves suspension or alteration of some or all existing legal interests in the business and property and may involve extinguishment of some interests. It is only because of such changes in legal rights that the matter of reorganization comes into courts. When it does come into a court, a reorganization must proceed in accordance with the machinery and methods there existing.

Absent statutes, this machinery and these methods have been such as provided in a court of equity. The situation created by the reorganization of large businesses was a novel one from a legal standpoint. It was that of a distressed business which could not go on and where some or all classes of persons financially interested therein were faced with serious loss; where the assets derived value largely through being parts of an active business unit; where destruction of this unit would materially increase the loss to all classes; where there was no real market for the business as a whole and no real prospect of sale thereof except at ruinous price; where a majority of some one or more classes desired to try to preserve more of the value of their interest by continuing the business under a rearrangement of some or all interests; where the attempted rearrangement must be legally binding on all persons affected thereby to be entirely effective; where some interests might prefer to realize and suffer their losses instead of trying to continue the business or might not agree to the plan of rearrangement of their interests proposed.

It is the natural growth of our law (absent statute) to endeavor to deal with controversies in accordance with existing conception of rights and by existing legal remedies. When the controversies arise out of a novel change in economic situations, there is usually a period of difficulty and sometimes of injustice before the courts can adjust their views to the new actualities and declare a view of rights and create efficient remedies fitted to the actualities of the new situation. This period is one of development or accommodation. Such is the history of the law as to reorganizations. The controversies there arose between those who wanted to reorganize and those who either did not want to participate or who did not want to participate in the plan proposed or who were given no place in the reorganization. Opportunities for oppression of dissenters by participants through unduly using their combined power at the expense of dissenters developed on the one hand and oppression of participants by dissenters through undue demands as the price for peace on the other hand raised the problems which the courts had to determine. Those problems were to permit reorganizations, but to prevent oppression either of dissenters by participants or of participants by dissenters. This they attempted to work out through the existing legal methods of a receivership and a foreclosure sale. We need not trace the (at times labored) development of this law because, for practical purposes, it is now virtually supplanted by the recent amendments to the Bankruptcy Act relating to reorganizations (11 USCA §§ 205, 207). It is enough to state what we deem its present status.

That status is that reorganizations through receiverships and foreclosure sales are legally recognized; that every person

interested in the property has a right to insist upon a plan of reorganization fair to him; that he has a right to participate or not; that he has a right to the value of his interest in the property if he chooses not to participate; that he must (as in all legal rights) act seasonably; that where a judicial sale is made in furtherance of a reorganization, a successful bid by the reorganizers may be challenged by dissenters as inadequate; that such bid must be declared inadequate if it is "grossly" lower than the value which should be realized for the property at a forced judicial sale. We have not thought it necessary to burden this opinion with a detailed discussion of the various cases which have, step by step, developed these rules. This is true because the recent amendments to the Bankruptcy Act (11 USCA §§ 205, 207) have defined methods of corporate reorganization which will undoubtedly supplant the equity receivership-foreclosure. Some of the more important cases in which this development of the equity method may be traced are: Kearney v. Taylor, 15 How. (56 U. S.) 494, 14 L. Ed. 787; Ketchum v. Duncan, 96 U. S. 659, 24 L. Ed. 868; Sage v. Central Railroad Co., 99 U. S. 334, 25 L. Ed. 394; Graffam v. Burgess, 117 U. S. 180, 6 S. Ct. 686, 29 L. Ed. 839; Pewabic Min. Co. v. Mason, 145 U. S. 349, 12 S. Ct. 887, 36 L. Ed. 732; Louisville Trust Co. v. Louisville, etc., R. Co., 174 U. S. 674, 19 S. Ct. 827, 43 L. Ed. 1130; Ballentyne v. Smith, 205 U. S. 285, 27 S. Ct. 527, 51 L. Ed. 803; In re Metropolitan Ry. Receivership, 208 U. S. 90, 28 S. Ct. 219, 52 L. Ed. 403; Northern Pac. R. Co. v. Boyd, 228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931; Kansas City S. R. Co. v. Guardian Trust Co., 240 U. S. 166, 36 S. Ct. 334, 60 L. Ed. 579; Waller v. Texas & P. R. Co., 245 U. S. 398, 38 S. Ct. 142, 62 L. Ed. 362; Southern Pac. Co. v. Bogert, 250 U. S. 483, 39 S. Ct. 533, 63 L. Ed. 1099; Kansas City Terminal R. Co. v. Central Union Trust Co., 271 U. S. 445, 46 S. Ct. 549, 70 L. Ed. 1028; Home B. & L. Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481; First Nat. Bank v. Flershem, 290 U. S. 504, 54 S. Ct. 298, 78 L. Ed. 465, 90 A. L. R. 391; Magann v. Segal, 92 F. 252 (C. C. A. 6); Merchants' Loan & Trust Co. v. Chicago Railways Co., 158 F. 923 (C. C. A. 7); Investment Registry, Limited, v. Chicago, etc., R. Co., 212 F. 594 (C. C. A. 7); In re Howell, 215 F. 1 (C. C. A. 2); Guaranty Trust Co. v. International Steam Pump Co., 231 F. 594 (C. C. A. 2); Fearon v. Bankers' Trust Co., 238 F. 83 (C. C. A. 3); Simon v. New Orleans, etc., R. Co., 242 F. 62 (C. C. A. 5); Painter v. Union Trust Co., 246 F. 240 (C. C. A. 6); U. S. & Mexican Trust Co. v. U. S. & Mexican Trust Co., 250 F. 377 (C. C. A. 8); Graselli Chemical Co. v. Aetna Explosives Co., 252 F. 456 (C. C. A. 2); Lane v. Equitable Trust Co., 262 F. 918 (C. C. A. 8); Phipps v. Chicago, etc., R. Co., 284 F. 945, 28 A. L. R. 1184 (C. C. A. 8); Beers v. Equitable Trust Co., 286 F. 878 (C. C. A. 8); Mountain States Power Co. v. A. L. Jordan Lumber Co., 293 F. 502 (C. C. A. 9); Habirshaw Elec. Cable Co. v. Habirshaw Elec. Cable Co., 296 F. 875, 43 A. L. R. 1035 (C. C. A. 2); Palmer v. Bankers' Trust Co., 12 F.(2d) 747 (C. C. A. 8); Jameson v. Guaranty Trust Co., 20 F.(2d) 808 (C. C. A. 7); Kansas City Terminal R. Co. v. Central Union Trust Co., 28 F.(2d) 177 (C. C. A. 8); In re Alamac Operating Corporation, 42 F.(2d) 120 (C. C. A. 2); Speers, Sand & Clay Works v. American Trust Co., 52 F. (2d) 831 (C. C. A. 4); Bethlehem Steel Co. v. International Combustion Eng. Corporation, 66 F.(2d) 409 (C. C. A. 2); Guaranty Trust Co. v. Missouri Pac. R. Co., 238 F. 812 (D. C. E. D. Mo.); St. Louis-San Francisco R. Co. v. McElvain, 253 F. 123 (D. C. E. D. Mo.); Guaranty Trust Co. v. Chicago, etc., R. Co., 15 F.(2d) 434 (D. C. N. D. Ill.); American S. S. Co. v. Wickwire Spencer Steel Co., 42 F.(2d) 886 (D. C. W. D. N. Y.) affirmed 49 F.(2d) 766 (C. C. A. 2)—also numerous unreported opinions or forms of decrees, among which are Guaranty Trust Co. v. International Typesetting Co. (S. D. N. Y. Feb. 19, 1916); Amer. Steel Foundries v. Chicago, R. I. & P. Ry. Co. (N. D. Ill. June 12, 1917); Railway Steel Spring Co. v. Chicago & E. I. R. Co. (N. D. Ill. May 3, 1921); and In re Bijur Motor Lighting Co. (by Judge Manton sitting in a New York District).

The matter involved in this immediate issue is the value of appellant's interests as a dissenter—this value being its proportion of the entire value. If there had been no reorganization, this entire value would be what was realized at an open fair foreclosure sale. Considering the character and extent of this property as shown by the record and the general economic condition at the time of the foreclosure sale (of which we take notice), it is evident that the only substantial purchaser of any or all of

the properties must be those already interested therein. Possibly with the exception of appellant, we are not apprised of any individual bondholder in any class of sufficient financial ability or sufficient holding of first mortgage bonds (usable in purchase payment) who could bid serious amounts at these sales. It was a situation where the only hope was through an extensive combination of bidding power (represented by first mortgage bonds which could be used in payment). What then, should they bid as fair to nonparticipants? The bids were $1,400,000 for the Ambassador and the Grand Central properties, covered by the Grand Central foreclosure; and $600,000 for the Missouri property, covered by the St. Louis foreclosure.

The financial situation of the business, in so far as it can be gleaned from the record, was as follows: On April 20, 1925, the Central Properties first mortgage was executed to secure bonds for $4,500,000 bearing 6 per cent. interest (7 per cent. after maturity) maturing serially commencing April 20, 1928, with final maturity of October 20, 1941. This was reinforced by a chattel mortgage of August 30, 1927—provided for in the above mortgage of April 20, 1925. Of these bonds, those maturing on or before April 20, 1932, in the sum total of $450,000 were paid leaving $4,050,000 outstanding. Also, all interest was paid up to April 20, 1932. At the date of the order of sale (December 28, 1933) no further payments had been made and interest to $356,201.35 had accumulated, making the entire indebtedness on these bonds at that time $4,519,377.35 less $72,006.54 (in the hands of the trustees under the mortgage), thus leaving a foreclosed indebtedness of $4,447,370.81, in addition there were two subsequent mortgages (also covering the St. Louis Properties) for $850,000 and $1,000,000, respectively. Upon February 1, 1932, there was default in interest ($30,000) due on the third mortgage and later there was default on the second mortgage.

On January 15, 1928, St. Louis Properties executed a mortgage securing bonds for $2,000,000 bearing 6 per cent. (7 per cent. from maturity) maturing serially beginning January 15, 1931, with final maturity on January 15, 1940. All interest and bonds ($82,500) maturing on or before February 15, 1932, were paid. Since that date, both interest and maturing principal have been in default. After giving credit for $3,750 (deposited January 15, 1932, toward interest), the default on these bonds on the date of the order of sale totaled $2,100,507.49. The two above subsequent mortgages covered this property also.

The creditor's bill was filed and the receiver appointed on August 19, 1932. The bill contained general balance sheet items from the books of the company as of June 30, 1930 (probably 1932 intended). These show "current assets" (including "Life Insurance"—cash value $22,514.34) of $167,569.91; "Deferred Expenses" (including "interest" $47,525) of $59,526.20; "Liabilities" (including "interest" $182,252.02 and "Bondholders' Income Tax [contingent]" $18,204.03) of $256,778.34; included in "Capital Liabilities" were "Paramount Note" $48,000 and "Central Properties Corp. (contingent)" $39,247.47. While the above items of "interest," "Bondholders' Income Tax (contingent)," "Paramount Note," and "Central Properties Corp. (contingent)" are not further explained, the above showing is not favorable to the business. The only further information concerning the condition, income, or expenditures of operating the business is contained in a "Receiver's Report of Cash Receipts and Disbursements for the Month of May, 1934," filed June 22, 1934 (two weeks before the sales), and an item in the special master's final report filed December 11, 1934. This report of the receiver is set out in full in the footnote.[1] The item in the

---

[1] Ambassador Building

| | | |
|---|---|---|
| Balance—April 30, 1934.......... | | $172,855.16 |
| Receipts | | |
| Collections from Tenants: | | |
| Accounts resulting from Receiver's Operations— | | |
| Theatre Rent......... | $ 4,000.00 | |
| Other Tenants & Sundry Charges........ | 17,480.80 | |
| Miscellaneous ................... | 47.75 | 21,528.55 |
| | | $194,383.71 |

Disbursements
  Expenses resulting from Receiver's Operations—

| | | |
|---|---:|---:|
| Salaries & Wages | $ 3,406.46 | |
| Management Fee | 908.23 | |
| Other Expense | 3,955.54 | 8,270.23 |
| | | $186,113.48 |

Deduct:
  Payments to Lawton, Byrne & Bruner Insurance Agency Company in accordance with court order previously charged to unclassified, pending distribution..    16,452.13    $169,661.35

Ambassador Theatre

| | | |
|---|---:|---:|
| Balance, April 30, 1934 | $ 1,181.47 | |
| Receipts | None | |
| Disbursements | None | 1,181.47 |

New Grand Central Building & Theatre

Balance April 30, 1934    $ 5,456.84
Receipts
  Collections from Tenants:
    Accounts resulting from Receiver's Operations—

| | | |
|---|---:|---:|
| Theatre Rent | $ 700.00 | |
| Other Tenants & Sundry Charges | 822.00 | 1,522.00 |
| | | $ 3,934.84 |

Disbursements
  Expenses resulting from Receiver's Operations—

| | | |
|---|---:|---:|
| Salaries and Wages | $ 87.99 | |
| Management Fee | 15.15 | |
| Other Expense | 443.98 | 547.12 |
| | | $ 4,481.96 |

Add: Supplies & Services transferred from Missouri Building    31.11    4,513.07    $163,966.81

Missouri Building
  Balance, April 30, 1934    127,226.90

Receipts
  Collections from Tenants:
    Accounts originating prior to Receivership    $ 97.53
    Accounts resulting from Receiver's Operations—

| | | |
|---|---:|---:|
| Theatre Rent | 1,200.00 | |
| Other Tenants & Sundry Charges | 11,997.98 | |
| Miscellaneous | 414.69 | 13,710.20 |
| | | $140,937.10 |

Disbursements
  Expenses resulting from Receiver's Operations—

| | | |
|---|---:|---:|
| Salaries & Wages | 3,062.08 | |
| Management Fee | 634.29 | |
| Insurance Premiums | 70.30 | |
| Other Expense | 5,562.35 | 9,329.02 |
| | | $131,608.08 |

Add: Supplies & Service transferred to New Grand Central Building    31.11
               $131,639.19

Deduct: Payments to Lawton, Byrne & Bruner Insurance Agency Company in accordance with court order, previously charged to unclassified, pending distribution    61.33    $131,577.86

Missouri Theatre

| | | | |
|---|---:|---:|---:|
| Balance, April 30, 1934 | $ 551.28 | | |
| Receipts | None | | |
| Disbursements | None | | |
| | | 551.28 | $132,129.14 |

report of the master is "Received from Tom K. Smith, Receiver $152,402.75." At the hearing on objections to confirming the sales, there was no evidence of the cost, value, condition, earnings, or expenses of any of these three properties.

■ If we read aright this rather meager evidence, the picture presented thereby is of a financially heavily overburdened business which was in sore financial straits early in 1932 and the condition of which did not improve thereafter. It was this business which was purchased at the foreclosure sales. What it was then worth is very difficult to estimate. The property covered by the sales consisted of three separate, detached pieces. A prominent feature in two and the entire value of one of such pieces rested in a moving picture theater. One was a well located downtown office building also. One was a smaller office building outside the downtown district also. These three pieces were separately offered at the sales without bids. Only two bidders qualified. Only two bids (Jeffries for Warner Bros. of $1,000,000 and the committee of $1,400,000) were made in the Central Properties foreclosure and only the committee bid in the St. Louis Properties foreclosure. The successful bids represented approximately the then market value of the bonds foreclosed. On this record we

| | | |
|---|---:|---:|
| Unclassified | | |
| Balance, April 30, 1934......... | | $ 44,604.88 |
| Receipts | | |
| Miscellaneous Receipts....... | $ 47.15 | |
| Returned Checks (Per Contra) | 20.00 | 67.15 |
| | | $ 44,537.73 |
| Disbursements | | |
| Miscellaneous Expenses, Etc..... | $ 300.58 | |
| Returned Checks (Per Contra)... | 20.00 | 320.58 |
| | | $ 44,858.31 |
| Deduct: | | |
| Payments to Lawton, Byrne & Bruner Insurance Agency Company in accordance with court order, charged as Unclassified, pending distribution, now distributed as follows: | | |
| Ambassador Building......... | $ 16,452.13 | |
| Missouri Building............ | 61.33 | 16,513.46 |
| | | $ 28,344.85 |
| Add: | | |
| Excess deposit of Central Theatres Company at April 30, 1934, charged to Buildings in May, 1934, for electricity, etc., used.. | 351.78 | $ 28,696.63 |
| | | $267,399.32 |
| Deduct: | | |
| Purchase of $309,000.00 Par Value —Non-interest bearing U. S. Treasury Bills due 6–20–34.... | | 309,386.25 |
| Excess of Cash Disbursements Over Receipts During Period of Receivership | | $ 41,986.93 |
| Add: | | |
| Cash on Hand & on Deposit August 19, 1932, taken over by Receiver ..................... | | 45,116.30 |
| Cash on Hand & on Deposit May 31, 1934..................... | | 3,129.37 |
| Summary of Unpaid & Accrued Operating Expenses of Receiver at May 31, 1934: | | |
| Ambassador & New Grand Central Building........... | $ 9,104.22 | |
| Missouri Building............ | 9,417.74 | |
| Unclassified ................ | 297.48 | |
| | $ 18,819.44 | |

are unable to conclude that the amounts bid were so clearly or "grossly" inadequate as to justify overturning the approval thereof by a trial judge who, during the more than two years of receivership, must have gained an intimate knowledge of the properties and of their business history and who was in far better position to estimate their worth than are we on this record.

As to the contention that inclusion of second bondholders in the reorganization plans had the effect of "chilling" bidding at the sales. This could not have affected any bidders other than second mortgage bondholders because their bonds were not usable in payment of bids. Whether those holders were thus prevented from bidding is wholly problematical. It may fairly be inferred that had they intended to bid, inclusion of them in the plan would lessen or stifle such action. The extremely doubtful matter is whether they would have bid had they not been included. The outstanding second bonds were $850,000. The outstanding Grand Central first bonds were $4,050,000 and the St. Louis first bonds were $1,915,500. The property was in a very difficult financial situation. The first mortgage bonds could, generally speaking, be used in payment of bids. Second bond bids would be for cash. The court expressly held there had been no "chilling" of the bids and this record certainly fails to overthrow that conclusion.

### Fairness of Reorganization Plan.

As stated above, those interested in the property have the legal right to require that the plan of reorganization be "fair" as to them. Of course, as a practical matter, a controversy over such fairness must arise through the objections of some dissenter to the plan. Where such objections are seasonably made, as here, the action of the trial court is subject to review. Although such right of review exists, the presumption of verity in the trial court action which usually exists is much increased because of the very nature of the matter and it must clearly appear that the trial court erred. Kansas City R. Co. v. Central Union Trust Co., 28 F.(2d) 177 (C. C. A. 8).

The "nature of the matter" arises from the character of reorganizations. The reorganization of a distressed corporation is primarily and principally a business problem. It is the problem of extricating the business from a position where it cannot proceed and placing it in a position where it can continue to function. Obviously, this problem involves consideration and determination of many matters related to the particular business and is very largely a problem individual to the particular business. Among other elements, it involves an understanding of how and why the business came into difficulty; of what the difficulty is; of the present condition of the business and of the property; of whether there is a fair prospect that the business can be continued under some readjustment of rights; of what readjustment is workable to that end. Such understanding requires knowledge of the financial, management, and business history of the concern; of the extent, character, and condition of both assets and liabilities; of the past, present, and probable prospective earnings and expenses. Based upon such knowledge and understanding, a plan must be evolved which offers a reasonable prospect of success. In working out such plan, the rights of interested parties must be preserved through a "fair" right of participation therein. Obviously, knowledge and understanding of the various above matters and others can be gained only through intimate contact with the business. Through administration of the business by the receivership, the trial court gains vastly more knowledge than can ever be transmitted through a record to the appellate court. It is this difference in situation which properly moves appellate courts to accord added deference to conclusions reached by trial courts in reorganization matters.

To the plans here proposed and found fair by the trial court, appellant presents many objections. While we get a distinct impression that appellant has industriously combed these plans to find possible defects therein, yet this is no reason why one or more of them may not be substantial.

These objections are as follows: (1) That if the bid is adequate, the issuance of the new securities provided in the plan would be illegal under the law of Missouri; (2) that the provision for income bonds and several of the provided conditions governing such bonds was unfair; (3) that the allocation of 35 per cent. of the capital stock to others than holders of the foreclosed bonds was unfair; (4) that the stock voting trust was unfair as preventing operation for 15 years by the beneficial owners, in its power to sell the stock or the property and in the lack of proper opportunity for the bondholders to object to such

816.

sale; (5) that the provision as to operation of the theaters is unsatisfactory, imperilling income therefrom; (6) that there was no provision for participation by nondepositing second mortgage bonds; (7) that it was unfair for the committees not to submit to bondholders organization plans presented by others to the committees.

The record is meager and quite evidently lacks much which the parties and the trial court knew in passing on these plans and the objections thereto. However, there are some matters of which we may be fairly sure from the record. We do know that, so far as this record shows, the business first came into serious difficulty in January and February, 1932. At that time the defaults on the various mortgages began and shortly afterwards there were other creditors, who were unpaid. This situation brought about the receivership in August, 1932. As heretofore stated, we are almost entirely unadvised as to the progress of the business during the two years of the reccivership, but it is a fair inference from the slight showing in the record that it was not prosperous. The monthly report of the receiver (the only one in the record) for May, 1934—near the end of the receivership management—does not reveal a hopeful condition. Also, the fact that the plans contemplated only income bonds is highly significant as revealing that a large majority of those interested in the paramount bonds had grave apprehension as to the future earning power and sought to protect the new business from all mandatory fixed debt charges—this protection being furnished at their expense since income bonds depend, for return, on the success of the business and the sale value of the bonds may be affected by such uncertainty. It is fair to infer that those most interested in the business and the property and, therefore, presumably as familiar with their past, present, and prospective future as any one, deemed the situation rather desperate. The approval of the plans by the court adds the weight of an impartial personage educated in such matters by two years of administration of the property and conduct of the business. This record contains nothing to justify us in taking a different view of the situation. If we are reasonably to judge the fairness of these plans, we must examine them in view of this condition which they were designed to remedy.

The Central Properties plan contemplated two classes of securities: Common stock and one issue of income bonds. The stock was 61,500 shares par value $1. The bonds were to be registered noncoupon and were to replace, in like amount, the principal of the first mortgage bonds; were authorized to the full outstanding amount ($4,050,000); and were to be issued "pro rata" to depositing holders. They were to bear 5 per cent. interest, cumulative after two years and payable semiannually from income—if such income was less than 5 per cent. at any payment date, the distribution thereof for interest was to be measured by the nearest one-fourth per cent. of interest. Payment of interest and of bonds before maturity was provided for as follows: A depositary was to control a sinking fund to be made up of all of the net income of the corporation; from this fund, interest was first paid; next, three-quarters of the remaining fund was to be applied to redemption of bonds at par and accumulated interest—bonds could be presented by holders annually for such redemption, callable on 30 days' notice or (with approval of the voting trustees) bought in open market at the lowest prices tendered—; after use of such three-quarters of the sinking fund and if there was then no default under the bond mortgage, the remaining one-fourth was to be repaid to the company to be used "for the payment of dividends or for other corporate purposes." All of such bonds might be satisfied upon payment to the mortgage trustee "of a consideration, either in cash or in part cash and part securities, equal to or less than the total amount of outstanding 'Income Bonds' and * * * the terms and provisions of said 'Trust Deed' or of the 'Income Bonds' may be otherwise altered or modified; provided that in any such event the holders of 75 per cent. or more in amount of the outstanding 'Income Bonds' shall consent in writing thereto, and provided further, that any such alteration or modification shall not in the opinion of a majority of the Voting Trustees adversely affect the stockholders."

The amount of capital stock issued was determined as follows: One share for every $100 in deposited first mortgage bonds (the aggregate thereof to be 65 per cent. of the entire stock issued); then 25 per cent. for depositing second mortgage bonds to be divided pro-rata; and the remaining 10 per cent. for such persons "as may from time to time be designated by the Board of Directors of the new corporation, for or in connection with the management of the

properties of the new corporation." All of the capital stock issued was to be issued to six voting trustees, of whom four were to be named by the first mortgage committee, one by the second mortgage committee, and one by Charles P., Spyros P., and George F. Skouras and Clarence M. Turley—vacancies to be filled by the remaining voting trustees and any trustee removable on written direction of three-fourths in amount of the outstanding stock and of three-fourths of the oustanding bonds. The voting trust was to continue 15 years unless sooner terminated with the consent of a majority of the voting trustees. The power of the voting trustees to dispose of all of the property or all of the stock was limited by provisions that notice of the terms and conditions of the sale should be mailed to all stockholders at least 15 days before a stockholders' meeting to vote on the sale and they are not to vote for the sale at the meeting if, prior thereto, one-third of the stock dissents in writing. To take care of reorganization expenses, if cash coming from the receiver proved insufficient, a first charge on the sinking fund or a paramount mortgage was authorized.

The plan covered also two other matters: (1) A lease of the theater properties for ten years to Allen L. Snyder and (2) the guaranties of the first mortgage bonds by Charles P. and Spyros P. Skouras and of the second mortgage bonds by the three above Skouras brothers and Clarence M. Turley. As to the former, it is useful to say only that it related to operation of a portion of the properties involved and the "failure or inability" of the new company to make the lease was expressly not to "in any way affect the remaining provisions" of the plan. As to the guaranties, the evident purpose was to afford the guarantors opportunity to work out their existing liabilities as guarantors in the new set-up. As to the first mortgage bonds, the plan was, in a sense, to transfer the guaranty to the income bonds pro-rata and to the extent of any deficiency decree secured against the guarantors. The guarantors were given a right of subrogation limited in exercise to after full payment of all income bonds; they were released from their personal guaranty of the deposited first mortgage bonds; and were allowed to designate one of the voting trustees. Unless this offer of the guarantors became a contract, any deficiency decree realization against them was to be pro-rated among the deposited first mortgage bonds. As to the guaranty of the second mortgage, the plan was for the guarantors to replace their existing guaranty by an agreement to purchase from the participating second bondholders the 25 per cent. of new capital stock to be issued them—this purchase to be on terms set out in an exhibit to the plan.[2] We next consider the specific objections here urged to these plans.

It is contended that, if the bids are deemed adequate, the issuance of the securities provided in the plans would be unlawful under Missouri law. The law intended is contained in provisions of the State Constitution (article 12, § 8) and statutes (R. S. Mo. 1929, §§ 4546 and 4933 [Mo. St. Ann. §§ 4546, 4933, pp. 1994, 2250]) which provide that no corporation shall issue stock or bonds except for money paid, labor done, or property actually received. The argument is that:

"If the amounts paid for the properties at the foreclosure sales represented their reasonable values, the plan providing for the issuance of the new bonds in excess of the price paid for the property contemplated the commission of an illegal and fraudulent act and could not be countenanced by the Court. The plan could be countenanced only upon the assumption that the properties sold were worth at least the face amount of the new securities issued."

The argument is ingenious but not convincing when applied to the facts and situation. It must be conceded that it is necessary for the reorganizers to comply with these requirements of the state law in the issuance of the stock and bonds provided for in the plans. However, the foreclosure sales prices are by no means measures of the values of the properties for corporation purposes. Prices at foreclosure sales are notoriously under actual values (unless the property sold has a free open market value, as listed securities, grain, live stock, etc.). Such dispositions are forced sales. It is this forced sale value which is in mind when adequacy of bids at foreclosure is considered. It is the actual fair value at a free sale that is in mind when considering the value of property used for payment of corporate stock and bonds issued.

---

[2] The plan under the St. Louis Properties foreclosure was in all essentials, identical with the above plan—the principal of the bonds being $1,915,500 and the authorized common stock of the new company being 30,000 shares.

818

Another consideration, in so far as the income bonds are concerned, is the necessary nature of reorganization. Almost always, properties to be reorganized involve one or more liens thereon of relatively considerable extent. To hold that such liens could not, in some form and to some extent, be transferred to the reorganized property would practically defeat all corporate reorganization under appellant's construction of the Missouri law. Yet the Missouri law (R. S. Mo. 1929, § 7727 [Mo. St. Ann. § 7727, p. 7375]) expressly recognizes reorganizations and permits issuance of securities in a new corporation to old "security holders or other creditors of such [old] corporation in the process of a bona fide reorganization." Also see Gibson v. Kansas City Refining Co., 32 F.(2d) 658; P. R. Walsh Tie & Timber Co. v. Missouri Pac. R. Co., 280 F. 38; Sioux City, O'N. & W. R. Co. v. Manhattan Trust Co., 92 F. 428, cases in this Court.

■ Another group of objections are aimed at the income bonds. These objections are: That default is prevented during the life of the bonds (15 years); that they are less marketable than fixed interest bonds; that the provisions as to release or modification of the bonds place 25 per cent. of the bonds under control of the other 75 per cent. and also lessen marketability. It may be conceded that each of these challenged provisions may well have a depressing effect upon the market value of the income bonds, but there is nothing therein unfair to appellant. Its first mortgage bonds retain their predominate lien position through the income bonds; it is treated like others in the same class; the evident purpose of making the bonds income bonds is to remove the very menace of fixed charges which occasioned the difficulties of the business resulting in reorganization. As a holder of second mortgage bonds, the provision for income bonds is clearly beneficial to appellant which would receive stock for its second mortgage bonds. The provision giving 75 per cent. of the bonds power to consent to release or to alteration is not unfair. No release or alteration could affect appellant in any way different to other bondholders; it is not to be assumed that 75 per cent. of bonds (widely held) would agree to release or alteration disadvantageous to themselves; the provision permits elasticity of action for accommodation to future situations as they may develop in the progress of the business.

■ Another objection is that the allocation of 35 per cent. of the stock to others than the first mortgage bondholders is prejudicial to appellant as a holder of first mortgage bonds. Of this 35 per cent., 25 per cent. went to holders of deposited second mortgage bonds pro-rata and 10 per cent. was held to be used in the corporation business. It is difficult to see any unfairness to holders of income bonds in providing the corporation with a source of working capital (from this 10 per cent. of stock) with which to earn income.

■ As to the 25 per cent. allotted to depositing second mortgage bondholders, the situation of appellant is as follows: Appellant held $141,100 of $4,050,000 outstanding first mortgage bonds under the Central Properties foreclosure or slightly under 3.5 per cent. It held $30,100 of $1,915,000 outstanding first mortgage bonds under the St. Louis Properties foreclosure or slightly over 1.5 per cent. Also it held $154,800 of $850,000 outstanding second mortgage bonds under both foreclosures or slightly over 18.4 per cent. Had it elected to deposit its second mortgage bonds in both foreclosures, it would, under the respective plans, have received 18.4 per cent. of 15,375 shares (25 per cent. of 61,100 shares) under the Central Properties plan, or 2.829 shares; and 18.4 per cent. of 7,500 shares (25 per cent. of 30,000 shares) under the St. Louis Properties plan, or 1,380 shares. While if this 25 per cent. of stock had been pro-rated to the respective first mortgage bonds, it would have received 3.5 per cent. of 15,375 shares under the Central Properties plan, or 538 shares, and 1.5 per cent. of 7,500 shares under the St. Louis Properties plan, or 112 shares. In short, had it acted under the plans, it would have received 2,829 shares and 1,380 shares, respectively, while had the plans lacked this provision now objected to, it would have received only 538 shares and 112 shares, respectively. In this situation of the appellant, we can see no basis for this attack upon the plans. They could not have worked out unfairly as to it.

■ Appellant attacks the provisions in the plans as to the voting trust on three grounds: The first objection is that for 15 years the "beneficial owners" were deprived of the operation of the property. The period of 15 years obviously is to harmonize with the life of the income bonds. A voting trust for corporate stock is not in and of itself objectionable [Mackin v.

Nicollet Hotel, 25 F.(2d) 783 (C. C. A. 8)] and no reason has been shown why this particular trust would operate unfairly. A second objection is in the power given the voting trust to sell all of the stock or of the property. This power seems, under the situation here, to be safely limited as to the stockholders by permitting one-third of the stock to veto such sale, and as to the bondholders by their selection of two-thirds of the membership of the voting trust. A detail objection is to the time of notice of such sale of 15 days as being too brief. No convincing showing to that effect is here.

▮ Another contention is that the provision of the plans as to leases of the theater properties is unfair as imperilling the income therefrom. The objections are that the theaters were to be leased to "unknown corporations to be organized by a Mr. Allen L. Snyder, who was not known to have had any experience whatever in the management or operation of theaters"; that the committees professed "ignorance as to who was to operate the theaters"; and that Snyder was relieved of all personal liability. The plans expressly provide that the provisions as to these leases are not essentials in the plans, so that such might be stricken out leaving the plans otherwise unaffected and also leaving the new companies free to make any operating agreements they desired—even similar hereto. However, so far as this record shows, there is no such evident unfairness or danger in these provisions as to justify annulment of them. The proposed contracts with Snyder are absent from the record. We know of their contents only from statements in the plans and from the evidence of Mr. Dysart who was chairman of the Central Properties first mortgage bondholders' committee.[3] We see no reason in this record to condemn these provisions of the plans.

▮ Another objection is that the plans contained no provision for participation of nondepositing second mortgage bonds. The

---

[3] The statement in the plans is as follows:

"The 'First Mortgage Committee' has received an offer from Allen L. Snyder to enter into a lease of the Ambassador and Grand Central Theatres for a term of ten years, a copy of which lease is hereto annexed, marked 'Exhibit A' and by express reference thereto made a part hereof. Said offer is conditional upon the said Snyder's acquiring a lease to the Missouri Theatre simultaneously with the acquisition of the lease to the Ambassador and Grand Central Theatres. The new corporation shall, upon acquiring the property in the manner hereinbefore provided, execute said lease as lessor, provided the lessee named in said lease has at such time executed the lease and made the deposits therein provided for. The failure or inability of the new corporation to enter into said lease shall not, however, in any way affect the remaining provisions of this agreement unless the 'First Mortgage Committee' shall elect to abandon the entire plan."

The statement of Mr. Dysart is as follows:

"A part of the Committee's plan consists of a proposed lease of the theatres to Mr. Allen L. Snyder, who is a citizen of St. Louis, formerly an engineer. The witness did not know whether Mr. Snyder was still engaged in that profession or not. Mr. Snyder has a right to form a corporation to take the leases. The Committee was not able in its negotiations either with Mr. Snyder, Warner Bros., Skouras Bros., or anyone else to find any-one who would undertake to assume personal liability in the operation of those theatres.

"Mr. Snyder was not assuming any personal responsibility in connection with the lease. The witness thought Mr. Snyder had no experience in the operation of moving picture theatres. The witness did not know whether it was a fact that Mr. Harry Koplar and his associates would operate the Ambassador Theatre. He did not know who was to operate it.

"As security for the fulfillment of the terms of the lease, by the corporation to be formed by Mr. Snyder, there is $70,000.00 in cash for Central Properties theatres and $35,000.00 for the Missouri. The rental of the Ambassador Theatre is to be at a minimum of $2,000.00 a week for the first two years, and then it steps up.

"The cash guarantee would not be a guarantee for one year's rent. If the tenant defaults in any four weeks either consecutive or cumulative, the lessor can take possession of the theatre and then have that nucleus there, and would have about thirty weeks to find another tenant. Snyder cannot continue to operate without paying his rental just because he has $70,000.00 up. The only provision with reference to who is to operate the theatres, is that they must be operated by competent, experienced picture show operators and there is no person or corporation chosen or that is in mind for the purpose of operating the theatres that the witness knows of."

orders confirming the foreclosure sales modified the plans by extending the period during which bonds might be deposited for participation to 21 days after such orders. Appellants contend that such provision is unfair to nondepositing second mortgage bondholders, since such as were dissenting would thereby be put to an election either to waive their right to appeal from the confirmation orders and join in the reorganization or to exercise their right to appeal and thereby forfeit all rights under the reorganization. We think this position well taken under the situation here. Under the plans, deposited second mortgage bonds were allowed 25 per cent. of the new stock and the three Skouras brothers and Clarence M. Turley (guarantors of these bonds) had offered to purchase the voting trust certificates representing this 25 per cent.:

"At a price per share to be determined by dividing the total principal amount of 'General Mortgage Bonds' participating in this plan by the voting trust certificates which are issued to the general mortgage bondholders under this plan of reorganization and under the plan of reorganization for the Missouri Building. The purchase price is payable 1% two years from the date of the 'Income Bonds' and 1% each year thereafter for the next succeeding nine years, the balance to be paid on the date of the maturity of the 'Income Bonds.' Upon failure of said individuals to pay the purchase price due in any one year, the holders of voting trust certificates issued to the general mortgage bondholders shall have the right at any time thereafter either to be relieved of their obligation to sell their voting trust certificates, retaining, however, any payments theretofore paid to them and also retaining their right to require said individuals to complete the purchase, or to declare the entire purchase price immediately due and payable. The offer is conditioned upon the 'General Mortgage Committee' releasing said individuals from their liability on the deposited 'General Mortgage Bonds', and it is therefore contemplated that upon the consummation of the plan of reorganization and the execution and delivery of a valid formal contract evidencing the obligation of said individuals to buy said voting trust certificates as hereinabove set forth, the 'General Mortgage Committee' will execute, and deliver to said individuals, a release of their liability as guarantors on the deposited 'General Mortgage Bonds.' A copy of said offer is hereto attached, marked 'Exhibit E' and by this reference made a part hereof."

These were worthwhile rights accorded the second bonds. Under the plans, nondeposited second bonds would receive nothing from the property. Obviously, a holder of second bonds could not challenge the plans without withholding his bonds from deposit. If he has a right to challenge the plans in the trial court, he has, generally speaking, a right to test by appeal (without alteration of his rights) an unfavorable determination in the trial court. We say this is true "generally speaking" because we do not mean to say that in all instances a right of participation may be preserved during appeal. There may be instances where a dissenter has a choice between participation and a payment and where the plan is so formed that it would be seriously endangered by the delay caused by a dissenter's appeal. As to such situations and possibly others, we leave the matter expressly unexamined and undetermined. What we do say is that an appellant from the fairness of a plan of reorganization where his only chance of any realization whatsoever entirely depends upon participation under the plan cannot fairly be denied such participation solely because of delay entirely caused by his prompt prosecution of an appeal from an order approving the plan. This determination does not mean that the plans here involved are rendered void by this defect, but it does mean that this appellant must be allowed to participate in the plans to the extent of any or all of the above second mortgage bonds held by it. Such participation is limited to such of said bonds as it may offer for participation within 20 days after filing below of the mandate of this court on final determination of this litigation.

■ The remaining contention of appellant is that it was unfair for the bondholders' committees not to inform the bondholders of other plans of reorganization submitted to the committees. While a trial court may, in its discretion, order committees to make lists of bondholders available to those formulating other plans or may take other proper steps for the purpose of informing all bondholders as to all plans seriously advanced, yet there is no showing in this record of any request to or refusal of the court so to do. Absent such order there is no legal obligation upon such committees to circulate any plans oth-

er than their own. Even if there were, it would not affect the fairness of the plan itself. Also, the plan urged by this appellant was before the court, considered by it and, in the confirmation order, disposed of because "the Plan of Reorganization proposed by said Bondholders' Committee is more practicable and is superior to that proposed by Warner Bros. Pictures, Inc."

### Conclusion.

The appeal in No. 10272 is dismissed as to David Berger, Esther Berger Epstein, and Joseph Berger. The orders from which these appeals were taken are affirmed with the modification that appellant Warner Bros. Pictures, Inc., be allowed participation in such plans of reorganization to the extent of such part of its holdings of $154,-800 par value of second mortgage bonds as it may offer for such participation within 20 days after the filing in the trial court of the mandate of this court on final determination of this litigation. Three-fourths of the costs of these appeals to be paid by Warner Bros. Pictures, Inc., and one-fourth by appellees.